Roy PENNY, Charles Hass, Danny Gray, Lon Eilders, Larry Dempsey and Bobby Tanner, Individually and as the Executive Committee of Police Local 644 of the American Federation of State, County and Municipal Employees, Plaintiffs,

v.

Thomas KENNEDY, Commissioner of Fire and Police of the City of Chattanooga, Tennessee, and the City of Chattanooga, Tennessee, Defendants.

No. CIV-1-86-417.

United States District Court,
E.D. Tennessee, S.D.

Nov. 13, 1986.

Charles P. Dupree, Chattanooga, Tenn., for plaintiffs.

Randall L. Nelson, Chattanooga, Tenn., for defendants.

MEMORANDUM

EDGAR, District Judge.

Six Chattanooga police officers have brought this action against the City of Chattanooga, Tennessee and its Commissioner of Fire and Police, Tom Kennedy. Plaintiffs seek declaratory and injunctive relief regarding a proposed program of mass urine testing of Chattanooga police officers which the City is proposing to conduct. Plaintiffs assert federal question jurisdiction under 28 U.S.C. § 1331.

Although filed and heard separately, this case is essentially a companion case to *Roland M. Lovvorn, et al. v. The City of Chattanooga, Tennessee, et al.*, 647 F.Supp. 875 (hereinafter referred to as the "fire fighters case"), which deals with similar urine tests which the City proposes to administer to its Fire Department. This Court's opinion in the fire fighters case is attached to this memorandum as an appendix and is hereby made a part of the decision of the Court in this case.

The facts in this case are very similar to those in the fire fighters case. Department-wide urine tests were administered to all members of the Chattanooga Police Department beginning in early March 1985. Police officers were tested when they took their "in service" training. They were given four to six days' notice of the tests. No Police Department personnel witnessed the donations of the first approximately 50% of the tests. However, the last 50% were witnessed. Police Chief Eugene McCutcheon changed his policy on this when one officer, who had tested positive, told him that it was possible for an officer being tested to switch a "clean" sample for the officer's urine. The only information that Chief McCutcheon had regarding drug use in the Police Department prior to the 1985 tests was the arrest and conviction of two police officers on drug-related offenses in previous years, along with two or three other instances where the department acquired independent information that officers had used illegal drugs.

The Chattanooga Police Department has 360 members. Only two officers tested positive for marijuana in the 1985 tests. A close monitoring of each of these individual's personnel records and behaviour patterns prior to the time that the tests were administered would have provided the City with "reasonable suspicion" to require these two officers to submit to urine tests for drugs. Before one of these officers tested positive in the 1985 tests, Chief McCutcheon and selected Police Department personnel strongly suspected him of drug dealing and were even conducting surveillance.

Defendants have initiated a new round of mandatory tests for the entire Police Department based on the following information:

1. A statement of one of the two officers who tested positive in 1985 that it is possible to switch urine samples.

2. "Rumors" of switched urine samples in the 1985 tests.

3. A tip from the Federal Bureau of Investigation that an officer of the department has been in contact with a drug dealer. (There is no indication that the Police Department has attempted to confirm this information.)

4. A statement (before the 1985 tests) made to Chief McCutcheon by an officer who admitted using marijuana (and was terminated) that "several" police officers used marijuana.

5. A statement made to Commissioner Kennedy by a police officer who had gone through a drug rehabilitation program that there had been some switched samples in the 1985 police tests.

Several weeks before the trial of this case, Chief McCutcheon stated that the Chattanooga Police Department had no drug problem. By the time of the trial he had concluded that the department does have a drug problem. Nevertheless, he still concedes that there is no drug problem in "ninety percent" of the department. Aside from the Chief's opinion, there are

no facts which have been presented to the Court from which it could be concluded that the remaining ten percent have a drug problem. There is no indication that any police officers have tested positive for drugs of any kind in the 1986 tests conducted to date.

There is no real difference in the balance of the respective rights of the City and the police officers under the fourth amendment from that in the fire fighters case. For reasons that are so obvious as to not require elaboration, the public does not want a police force that uses illegal drugs. On the other hand, police officers, like fire fighters, are possessed of a certain level of constitutional protection which cannot be lowered.

For the reasons stated by this Court in its opinion in the fire fighters case, the defendants must have reasonable suspicion before they may test police officers for illegal drugs. On the facts presented to this Court, there is no reasonable suspicion which would justify the administration of these tests at this time. Therefore, the current tests violate the fourth amendment rights of Chattanooga police officers.

The defendants do not have to rely on across-the-board drug tests to insure the integrity of the Police Department. Information concerning drug problems can be acquired by physical observation of police officers, citizens complaints, tips from other law enforcement agencies and other means. Once a reasonable suspicion has developed, a test may be conducted. It is noteworthy that the Police Department did have facts amounting to a reasonable suspicion that would have allowed the testing of the only two officers who tested positive in the 1985 tests.

As was emphasized in the Court's opinion in the fire fighters case, this does not mean that the Chattanooga Police Department may not administer urine tests to its police officers for the presence of illegal drugs. This decision does mean that if such tests are given, they must be given on reasonable suspicion, their scope must be related to their objective, and they must not be excessively intrusive.

An appropriate judgment will enter.

### JUDGMENT

For the reasons expressed by the Court in its memorandum filed herewith, it is the JUDGMENT of the Court that the remainder of the department-wide drug tests of Chattanooga Police Department which are currently being conducted would violate the fourth amendment to the Constitution of the United States. The defendants, their agents and employees are hereby ENJOINED from conducting urine testing of Police Department personnel except in accordance with the terms of the memorandum filed herewith.

The plaintiffs shall recover of the defendants their costs of action.